**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**
**Docket No. 43485**

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | 2017 Unpublished Opinion No. 425 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: April 6, 2017 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| **STEPHEN WILLIAM LUNDQUIST,** | ) | **THIS IS AN UNPUBLISHED** |
| | ) | **OPINION AND SHALL NOT** |
| Defendant-Appellant. | ) | **BE CITED AS AUTHORITY** |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. George D. Carey, District Judge.

Judgment of conviction, affirmed.

McCarthy Law PLLC; Gabriel J. McCarthy, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Jessica M. Lorello, Deputy Attorney General, Boise, for respondent.

_____

HUSKEY, Judge

Stephen William Lundquist appeals from his judgment of conviction after a jury found him guilty of felony stalking in the first degree. Lundquist argues there was insufficient evidence presented at trial to support his conviction, and as such, his conviction should be vacated. The State argues there was sufficient evidence to support Lundquist's conviction. We affirm.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

The victim in this case ended her relationship with Lundquist in September 2013. In October 2013, both a civil protection order and a no contact order were entered against Lundquist prohibiting him from having contact with the victim. Between October 2013 and January 2014, Lundquist continued to contact the victim while the protection and no contact orders were in effect. In January 2014, Lundquist was charged with stalking in the first degree, Idaho Code Section 18-7905. While that case was pending, the victim reported another incident

1

of unwanted contact. Lundquist was subsequently charged in a separate case with another count of stalking in the first degree. The cases were consolidated for trial.

The following testimony was adduced from the victim at trial. After the protection and no contact orders were issued, there were over fifteen instances where Lundquist contacted the victim or was at the same location as the victim. In October 2013, the following events occurred:

1. Lundquist called the victim and they spoke for approximately ten minutes. The victim begged Lundquist "to quit calling me, leave me alone, it's over." The victim ended the conversation by telling Lundquist: "Do not call me or come over." After the victim hung up the phone, Lundquist immediately called back. The victim testified she received multiple phone calls and text messages from Lundquist before she blocked his number. Once the victim blocked Lundquist's number, the victim began receiving phone calls from unidentified numbers, which had never occurred before the victim ended the relationship with Lundquist.

2. The victim also received emails and letters from Lundquist. Lundquist responded to an old email the victim sent in December 2010, stating he missed the victim. The victim then received a text message from Lundquist asking: "Do you check your e-mail? I assume you have the same one. I am really missing you." Lundquist also sent the victim a card, referencing God. The victim testified she was a religious person, and because the card contained references to God, the victim stated: "I feel like he's using God as a manipulation, to try to get me back." A second email from Lundquist stated: "I pray for a hedge of protection around you from Satan telling you lies and making you hate or distrust me, and that you can discern the truth." The email also stated: "God is preparing me for something I can't see yet, and perhaps for you as well."

3. At the end of October 2013, the victim saw Lundquist in her neighborhood, and as she drove by, Lundquist smiled and waved. When the victim went to a store near Lundquist's home, the victim watched Lundquist slowly drive by the store and look inside. The victim testified it was an "odd coincidence." The victim testified she was "creeped out," worried, and concerned for her safety. The victim felt harassed and every time she tried to move on and get her life in order, something would happen.

In November 2013, the following event occurred:

2

1. The victim went out to dinner with a friend and Lundquist arrived at the same restaurant. The victim stated Lundquist "just looked at me, walked around the counter, and then went and sat in the bar where he could see me directly." Lundquist was talking on his cell phone, but continued to stare at the victim. The victim went to a different restaurant a few miles away. The victim was at the second restaurant for a few hours where she was involved in a minor car accident in the parking lot.

In December 2013, the following events occurred:

1. Lundquist called the victim and said: "I saw you hit that car," a reference to the victim's minor car accident the previous month. The victim had not known Lundquist had been at the second restaurant and had not known Lundquist was watching her.

2. The victim received text messages from a number she did not recognize, referencing her relationship with Lundquist.

3. Lundquist left the victim a voicemail in which he sounded upset and irrational.

In January 2014, the following events occurred:

1. At a grocery store near Lundquist's home, the victim saw Lundquist standing and smiling at her.

2. The victim continued to receive text messages from the unknown number referencing her relationship with Lundquist.

3. The victim testified she did not go out much with friends because every time she went out, she would see Lundquist. However, when she went out with a friend, she specifically chose a restaurant in Meridian, Idaho, because Lundquist never "wanted to go any place in Meridian, and had stated that he hated Meridian." At the Meridian restaurant, the victim saw Lundquist standing approximately one foot behind the victim's friend, talking on his cell phone.

Between October 2013 and January 2014, the victim changed the door locks to her house, deactivated her garage door code, adopted a dog, and put a trip wire in her front yard. The victim started carrying pepper spray and parking close to her work building underneath lights. The victim testified she felt alarmed, annoyed, and harassed by Lundquist's actions. The victim testified she suffered emotional distress because of Lundquist.

In September 2014, while the January 2014 stalking charge was pending, the victim reported she visited two restaurants and after she left, she saw Lundquist looking inside the

restaurants. Then Lundquist followed the victim as she drove home. Subsequently, Lundquist was charged with stalking in the first degree, I.C. § 18-7905(a).

The jury found Lundquist guilty of the January 2014 stalking in the first degree charge and acquitted Lundquist of the September 2014 charge. The district court sentenced Lundquist to a unified five-year sentence, with two years determinate, suspended the sentence, and placed Lundquist on probation for five years. Lundquist timely appeals.

## II.

## STANDARD OF REVIEW

Appellate review of the sufficiency of the evidence is limited in scope. A finding of guilt will not be overturned on appeal where there is substantial evidence upon which a reasonable trier of fact could have found that the prosecution sustained its burden of proving the essential elements of a crime beyond a reasonable doubt. *State v. Herrera-Brito*, 131 Idaho 383, 385, 957 P.2d 1099, 1101 (Ct. App. 1998); *State v. Knutson*, 121 Idaho 101, 104, 822 P.2d 998, 1001 (Ct. App. 1991). We will not substitute our view for that of the trier of fact as to the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn from the evidence. *Knutson*, 121 Idaho at 104, 822 P.2d at 1001; *State v. Decker*, 108 Idaho 683, 684, 701 P.2d 303, 304 (Ct. App. 1985). Moreover, we will consider the evidence in the light most favorable to the prosecution. *Herrera-Brito*, 131 Idaho at 385, 957 P.2d at 1101; *Knutson*, 121 Idaho at 104, 822 P.2d at 1001.

## III.

## ANALYSIS

Lundquist argues there was insufficient evidence presented at trial to support his conviction for stalking in the first degree. A person commits stalking in the first degree if he "knowingly and maliciously . . . [e]ngages in a course of conduct that seriously alarms, annoys or harasses the victim and is such as would cause a reasonable person substantial emotional distress" and "[t]he actions constituting the offense are in violation of a . . . no contact order . . . ." I.C. §§ 18-7906(1)(a), 18-7905(1)(a). Lundquist raises three arguments on appeal: (1) there was insufficient evidence for the jury to find he acted knowingly or maliciously; (2) there was insufficient evidence for the jury to find he engaged in repeated acts of nonconsensual contacts; and (3) there was insufficient evidence for the jury to find his actions

4

seriously alarmed, annoyed, or harassed the victim, and no reasonable person would have suffered substantial emotional distress.

## A.    There Was Sufficient Evidence to Find Lundquist Acted Knowingly and Maliciously

Lundquist argues there was insufficient evidence for the jury to find Lundquist acted knowingly or with malicious intent.  The State asserted there was sufficient evidence for the jury to find Lundquist acted knowingly and maliciously because Lundquist repeatedly called the victim and repeatedly went to the same locations as the victim.

The State was required to prove beyond a reasonable doubt that Lundquist's actions were committed knowingly and maliciously.  *See* I.C. §§ 18-7906, 18-7905.  As Lundquist provided no authority or argument as to why there was insufficient evidence for the jury to find he acted knowingly, we address only whether there was sufficient evidence for a jury to find Lundquist acted maliciously.  *See State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996) (a party waives an issue on appeal if either authority or argument is lacking).  The definition of the term maliciously, as used in I.C. § 18-7906, is provided in I.C. § 18-101(4) as "import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law."  Under this definition, malice takes two alternative forms; it may be a "wish to vex, annoy, or injure another" or "an intent to do a wrongful act."

Lundquist argues because no evidence at trial indicated Lundquist intended to annoy, harass, scare, threaten, or frighten the victim, there was insufficient evidence to find he acted in a malicious manner or had malicious intent.  In support of his argument, Lundquist relies on *VanHorn v. State*, 889 N.E.2d 908 (Ind. Ct. App. 2008).  In *VanHorn*, the court held that the evidence was insufficient to prove that VanHorn committed stalking where the evidence presented was that VanHorn was observed sitting in his car parked on a city street near the home of the alleged victim on multiple occasions.  *Id.* at 911.  The court reasoned that because there was no protective order, VanHorn had no notice of the impermissibility of his conduct.  *Id.* at 912.  Had the alleged victim sought a protective order, the issuance of that protective order would have provided sufficient notice to VanHorn that his conduct was impermissible.  *Id.* at 913.  Thus, *VanHorn* is not persuasive authority or applicable.

In this case, unlike *VanHorn*, Lundquist had notice of the impermissibility of his conduct because the victim obtained a protection and no contact order.  After the protection and no contact orders were issued, the victim testified Lundquist continued to contact her by phone,

5

email, text, and letter. The victim also testified to multiple instances where Lundquist would arrive at the same location. For example, the victim testified when she went out to dinner with a friend, Lundquist arrived at the same restaurant, looked at the victim, and sat in a location where he could directly see her. Here, Lundquist had notice of the impermissibility of his conduct but nevertheless, continued to contact the victim in violation of the orders. As such, there was sufficient evidence presented that Lundquist intended to (and did) commit a wrongful act and consequently, acted maliciously.

Additionally, the victim testified she was annoyed, she felt harassed, and she could not move on with her life because Lundquist continued to contact her after the protection and no contact orders were issued. Based on the victim's testimony, there was sufficient evidence for the jury to find Lundquist wished to vex or annoy and consequently, acted maliciously under the definition. Although Lundquist argues the victim was "thoroughly impeached" at trial, we will not substitute our view for that of the trier of fact as to the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn from the evidence. *Knutson*, 121 Idaho at 104, 822 P.2d at 1001. Regardless of how the jury weighed the evidence, there was sufficient evidence presented at trial upon which a reasonable trier of fact could have found beyond a reasonable doubt that Lundquist acted maliciously.

**B.**  **There Was Sufficient Evidence to Find Lundquist Engaged in Repeated Acts of Nonconsensual Contacts**

Lundquist argues there was insufficient evidence for the jury to find Lundquist engaged in repeated acts of nonconsensual contact involving the victim. Lundquist provides explanations for some of the contacts that occurred after the issuance of the protection and no contact orders. Lundquist asserts that a ten-minute phone call between the parties was consensual because it lasted for ten minutes. Lundquist also asserts that the text messages and emails sent to the victim after the issuance of the protection and no contact orders were consensual because they contained no threats, and the victim did not block Lundquist's number. As to the instances where Lundquist arrived at the same location as the victim, Lundquist argues these occurrences were coincidental because they were all places the parties frequented throughout their relationship. The State contends the ten-minute phone call was nonconsensual regardless of the length. Further, the State asserts that although Lundquist offers alternative explanations for his behavior, the jury did not have to accept those explanations.

6

The State was required to prove beyond a reasonable doubt that Lundquist engaged in a course of conduct. *See* I.C. § 18-7906, 18-7905. The statute defines "course of conduct" as "repeated acts of nonconsensual contact involving the victim or a family or household member of the victim . . . ." I.C. § 18-7906(2)(a). Idaho Code Section 18-7906(2)(c) then defines "nonconsensual contact":

> (c) "Nonconsensual contact" means any contact with the victim that is initiated or continued without the victim's consent, that is beyond the scope of the consent provided by the victim, or that is in disregard of the victim's expressed desire that the contact be avoided or discontinued. "Nonconsensual contact" includes, but is not limited to:
>> (i) Following the victim or maintaining surveillance, including by electronic means, on the victim;
>> (ii) Contacting the victim in a public place or on private property;
>> (iii) Appearing at the workplace or residence of the victim;
>> (iv) Entering onto or remaining on property owned, leased or occupied by the victim;
>> (v) Contacting the victim by telephone or causing the victim's telephone to ring repeatedly or continuously regardless of whether a conversation ensues;
>> (vi) Sending mail or electronic communications to the victim; or
>> (vii) Placing an object on, or delivering an object to, property owned, leased or occupied by the victim.

As detailed above, the victim testified she received multiple phone calls, text messages, and emails from Lundquist after the issuance of the protection and no contact orders. For example, the victim testified she received a phone call from Lundquist in October 2013 that lasted approximately ten minutes. During that phone call, the victim begged Lundquist to quit calling, asked Lundquist to leave her alone, reminded Lundquist the relationship was over, and ultimately hung up after telling Lundquist to not call her or come to her house. Lundquist, however, immediately called the victim again. The victim ultimately blocked Lundquist's number, at which point Lundquist began calling from unidentified numbers. The victim also testified to four instances where Lundquist arrived at the same location as the victim. Lundquist presented evidence at trial that the restaurants and stores were areas close to his home and were places frequented by the victim and Lundquist during their relationship. We defer to the trier of fact with respect to the credibility of witnesses, the weight to be given the testimony, and the reasonable inferences to be drawn from the evidence. *Knutson*, 121 Idaho at 104, 822 P.2d at 1001. Thus, there was sufficient evidence presented at trial upon which a reasonable trier of fact

could have found beyond a reasonable doubt that Lundquist engaged in repeated acts of nonconsensual contact involving the victim.

**C.  There Was Sufficient Evidence Presented at Trial That the Victim Was Seriously Annoyed, Alarmed, Harassed and That a Reasonable Person in Her Position Would Have Suffered Substantial Emotional Distress**

**1.  There was sufficient evidence for the jury to find Lundquist's conduct seriously annoyed, alarmed, or harassed the victim**

Lundquist argues there was insufficient evidence for the jury to find his conduct seriously annoyed, alarmed, or harassed the victim because Lundquist never threatened the victim, and the victim had no reason to fear for her safety.  The State asserts I.C. § 18-7906(a) does not require a threat or a fear for safety in order to be seriously annoyed, alarmed, or harassed.  The State contends there was sufficient evidence for the jury to find Lundquist's conduct seriously annoyed, alarmed, or harassed the victim because the victim testified as much.  We agree with the State's reasoning.

Idaho Code Section 18-7906(a) requires only that Lundquist's conduct seriously annoyed, alarmed, or harassed the victim; it does not contain a threat requirement.  At trial, the victim testified she was "creeped out," worried, and concerned for her safety.  She testified she felt harassed because every time she tried to move on, Lundquist would contact her again.  The victim also testified she felt annoyed, alarmed, and harassed by Lundquist's actions.  Thus, there was sufficient evidence presented at trial upon which a reasonable trier of fact could have found beyond a reasonable doubt that the victim was seriously annoyed, alarmed, or harassed by Lundquist's conduct.

**2.  There was sufficient evidence for the jury to find Lundquist's conduct would have caused a reasonable person substantial emotional distress**

Lundquist specifically addresses the four instances where Lundquist and the victim were in the same location and argues that even if the victim was annoyed, alarmed, or harassed, no reasonable person would have felt similarly because the victim never feared Lundquist, and Lundquist never approached the victim, made any threats, or attempted to communicate with the victim.  In regards to the letter Lundquist sent to the victim referencing God, Lundquist argues: "the fact [the victim] chose to interpret references to God in such a way as to cause her annoyance certainly does not mean a reasonable person would feel similarly."

Lundquist's arguments focus on whether a reasonable person would have been alarmed, annoyed, or harassed by specific instances of his conduct.  However, these arguments conflate

8

the two requirements of I.C. § 18-7906(1)(a): (1) the conduct must seriously alarm, annoy, or harass the victim; and (2) the conduct is such as would cause a reasonable person substantial emotional distress. Additionally, Lundquist's arguments center on the fact that Lundquist never threatened the victim, but the requirements of I.C. § 18-7906(1)(a) do not require conduct to be threatening in order to secure a conviction. As we previously determined, there was sufficient evidence that Lundquist's conduct seriously alarmed, annoyed, or harassed the victim.

We now address whether Lundquist's conduct would cause a reasonable person substantial emotional distress. Here, the victim testified that after the protection and no contact orders were entered against Lundquist, Lundquist continued to contact the victim by phone, text message, and email on multiple different occasions. Given the victim's testimony to numerous instances of unwanted contact after the issuance of the protection and no contact orders, the jury could reasonably have concluded that a reasonable person in the victim's position would have experienced substantial emotional distress. Although Lundquist offers an alternative view of the evidence on appeal, we defer to the trier of fact with respect to the credibility of witnesses, the weight to be given the testimony, and the reasonable inferences to be drawn from the evidence. *Knutson*, 121 Idaho at 104, 822 P.2d at 1001. Thus, there was sufficient evidence presented at trial upon which a reasonable trier of fact could have found beyond a reasonable doubt that Lundquist's conduct would have caused a reasonable person substantial emotional distress.

## IV.

## CONCLUSION

There was sufficient evidence presented at trial upon which a reasonable trier of fact could have found beyond a reasonable doubt that Lundquist knowingly and maliciously engaged in repeated acts of nonconsensual contact that seriously alarmed, annoyed, or harassed the victim and would cause a reasonable person substantial emotional distress. Accordingly, Lundquist's judgment of conviction for stalking in the first degree is affirmed.

Chief Judge GRATTON and Judge GUTIERREZ **CONCUR**.

9